IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
WICHITA FALLS DIVISION

| | |
|---|---|
| PATRICIA A. COX, § | |
| Plaintiff, § | |
| § | |
| v. § | Civil Action No. 7:07-CV-057-BF (R) |
| § | |
| MICHAEL J. ASTRUE, § | |
| COMMISSIONER OF SOCIAL § | |
| SECURITY ADMINISTRATION, § | |
| Defendant. § | |

**AMENDED MEMORANDUM OPINION AND ORDER**

This is a consent case before the United States Magistrate Judge. Patricia A. Cox ("Plaintiff") appeals the decision of the Commissioner of the Social Security Administration (the "Commissioner") denying her claims for disability insurance benefits ("DIB") under Title II of the Social Security Act (the "Act") and Supplemental Security Income ("SSI") payments under Title XVI of the Act. This Court granted Plaintiff's September 29, 2008 Motion for Reconsideration. After a complete reconsideration of the record, this Court reverses the Commissioner's decision and remands the case for further consideration.

**Background**

Plaintiff was born on April 9, 1955. (Tr. 283.) She applied for DIB on April 8, 2003, alleging disability since September 29, 1999, due to major depression, a personality disorder, back problems, vision problems, a chemical imbalance, and hepatitis C. (Tr. 71-74, 85, 278-82.) Plaintiff contended that she had difficulty standing and walking because of peripheral vascular disease in her lower extremities, that she had difficulty in maintaining concentration, persistence or pace, and social functioning, and that she suffered from major depression and hepatitis C. (Tr. 22-23, 123.)

1

Plaintiff was 48 years old when she applied for benefits and 49 years old on the date of the hearing. (Tr. 21, 34.)

Plaintiff was considered a "slow learner" and attended special education classes, leaving school after the seventh grade. (Tr. 34, 37, and 307-08.) Her last job was as a housekeeper for a local hospital, although she was fired within a few months of being hired. (Tr. 124.) Her mental health care provider explained that Plaintiff was "always talking to the people and not getting her work done," that she "had difficulty understanding what to do," and that she "was constantly in trouble and going to the office for discipline." (*Id*.) Plaintiff's earning history shows that she held at least 33 different low-wage jobs, all for unusually short periods of time. (Tr. 77-84.) The jobs included food establishment work and nurse's aid. (*Id*.)

## Medical Evidence

Plaintiff has been treated regularly at Helen Farabee Regional MHMR Center ("Helen Farabee" or "MHMR") in Graham, Texas. In January 1999, Plaintiff was diagnosed with "major depression, recurrent, moderate; panic disorder; generalized anxiety disorder; personality disorder – histrionic and dependent traits." (Tr. 123.) Three psychoactive medications were prescribed: the antidepressants Remeron and Luvox as well as Klonopin, a tranquilizer in the benzodiazepine class. (Tr. 124.) Her MHMR Case Summary states, "Ms. Cox filed for [disability] benefits due to her mental diagnosis which she has had problems with all her life. [It] started early on with pulling her hair out and always wanting to die." (Tr. 123.) When her major depression surges, Plaintiff sometimes stays in bed for two weeks at a time. (*Id*.) Before seeking psychiatric help, she self-medicated for years with amphetamines, an addiction that has been in remission for approximately eight years. (*Id.*) The MHMR Case Summary continues:

> There have been some suicide attempts in the past. She jumped off a bridge into some logs. Another time she overdosed on medication. She slept it off and was never hospitalized. Her medications were then changed at the mental health center. She has anxiety and flashbacks of terrible things that have happened in her life; a murder she witnessed, abuse by [one or more of her six] ex-husbands, and catching her now husband in a compromising position with another man. When she has these attacks she starts shaking, blacks out and forgets days at a time, she doesn't eat, she won't go anywhere, won't answer the door or phone.

(*Id*.) In 1999, one doctor also noted that based on a Hepatic Panel, Cox may need to consider a Hepatologist (specialist in liver disease). (Tr. 128.)

On psychiatric evaluation on July 5, 2001, Plaintiff seemed to be doing better but her anxiety level was increased. She was pleasant and cooperative. The doctor noted that Plaintiff's thought processes were somewhat simplistic. The impression was major depressive disorder (recurrent, moderate) and personality disorder. Plaintiff's medications were adjusted. On November 1, 2001, she was presently stable on her medications and did not tell her psychiatrist of any side effects to the medication.

On April 21, 2003, Art Smith, M.D. ("Dr. Smith"), noted that Plaintiff described a "good deal of ongoing depression." (Tr. 265.) She described a lot of family-related stresses and reported her energy level to be low. However, Plaintiff also indicated that she had been sleeping well after she increased her dosage of Remeron and that her appetite was good. (*Id*.) Plaintiff also reported that she had gone back to church and found that it had been helpful. (*Id*.) In terms of Plaintiff's mental status exam, her affect was rather constricted and somewhat anxious. (*Id*.) Her underlying mood was moderate depression. (*Id*.) Dr. Smith diagnosed Plaintiff with mild to moderate depression. (*Id*.)

On June 11, 2003, Plaintiff underwent a consultative psychological evaluation conducted by Bobbie Lilly, Ph.D. ("Dr. Lilly"). (Tr. 153-56.) During the examination, Plaintiff stated that she

3

has difficulty with memory and depression and that on some occasions, she may go to bed for two weeks at a time. Plaintiff further acknowledged that she has difficulty sleeping if she does not take her medication. Plaintiff revealed that she has problems with her appetite, her energy level can be low, and she has difficulty with concentration. Plaintiff acknowledged feelings of worthlessness and helplessness and that she has had some suicidal thoughts in the past. Plaintiff's medications include: Luvox, Klonopin and Remeron.

As a result of this psychological evaluation, Dr. Lilly diagnosed Plaintiff with major depression, recurrent, moderate; amphetamine dependence in remission; and cognitive disorder, not otherwise specified. (Tr. 156.) Dr. Lilly noted that Plaintiff was markedly limited in the ability to understand and remember detailed instructions and the ability to carry out detailed instructions. (Tr. 158.) She found that Plaintiff was moderately limited in the ability to maintain attention and concentration for extended periods, the ability to perform activities with a schedule, to maintain regular attendance and be punctual within customary tolerances, and the ability to complete a normal workday and workweek without interruptions from psychologically- based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. (Tr. 157-61.) Dr. Lilly assessed Plaintiff's past and current GAF at 48.[1]

On June 30, 2003, when Plaintiff returned to Dr. Smith, she described improvement on the increased dosage of Luvox. (Tr. 263.) She acknowledged that her mood and sleep were generally

---

[1] GAF is a standard measurement of an individual's overall functioning level "with respect only to psychological, social, and occupational functioning." Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) ("DSM-IV-TR") at 32. A GAF of 41-50 indicates "**Serious symptoms** (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) **OR any serious impairment in social, occupational, or school functioning** (e.g., no friends, unable to keep a job)." (*Id.*)

pretty good. (*Id*.) She stated that at times she was under stress and got tired related to the demands on her (taking care of disabled family members). (*Id*.) Dr. Smith observed that Plaintiff's affect appeared bright and that her underlying mood was mostly near normal. (*Id*.)

By December 30, 2003, Plaintiff's depression had become worse. (Tr. 254.) Her daily activities were minimal. (*Id*.) She spent most of her time in bed or on the couch, seldom getting dressed. (*Id*.) She did not comb her hair, wear makeup, bathe, or tend to oral hygiene care. (*Id*.) This was noted to be in contrast to her past exceptionally well- groomed appearance. (*Id*.) Plaintiff was anxious and her mood was depressed. (*Id*.) She was diagnosed as meeting or equaling Listing 12.04 and 12.07 with symptoms of: "Adhedonia or pervasive loss of interest in almost all activities; Appetite disturbance; Decreased energy; Feelings of guilt or worthlessness; Difficulty concentrating or thinking." (Tr. 259.) These symptoms resulted in "Marked restrictions of activities of daily living [;] Marked restrictions in maintaining social functioning [;] Repeated episodes of deterioration and decompensation." (*Id*.)

By April 28, 2004, Plaintiff was homeless and living in a small tent at a camping park without basic hygiene facilities. (Tr. 298.) Her mental health caseworker noted that she suffered from major depressive disorder, had difficulties with memory and cognitive functioning, and had poor insight and judgment. (*Id*.) She was "liable in affect, almost histrionic, extremely emotional, possibly headed toward decompensation." (*Id*.)

With regard to physical impairments, during an emergency, Plaintiff was transported by ambulance to the hospital. (Tr. 241.) Her legs were described as "cool to [the] touch." (*Id*.) Plaintiff's symptoms and pain resulted from a "completely occluded distal aorta." (Tr. 246.) Plaintiff was admitted to the hospital on July 19, 2004, with severe peripheral vascular disease with

bilateral lower extremity ischemia. (Tr. 36, 238, 242-243.) Plaintiff underwent an aortobifemoral bypass on July 23, 2004, without complications, and afterwards, Plaintiff had excellent dorsalis pedis pulses. (Tr. 36, 242-243.) Before treatment, Plaintiff often complained of buttock pain shooting down her legs. (Tr. 242.) After surgery, Plaintiff had excellent dorsalis pedis pulses and was discharged in a stable condition. (Tr. 236.)

Mark L. Mankins, M.D. ("Dr. Mankins") examined Plaintiff again on October 6, 2004, for evaluation of right leg pain. At that time, Plaintiff had good pulses in her femoral arteries and dorsalis pedis arteries bilaterally. (Tr. 277.) Dr. Mankins stated that although Plaintiff showed some hypersensitivity to touch in her right foot, the color in her feet was good. (*Id.*) He suspected that she may have developed peripheral neuropathy, possibly ischemic related. (*Id.*) He noted her continued, although attempted, decrease in her tobacco use, with some degree of COPD. (*Id.*) Dr. Mankins' diagnosis also included chronic back pain. (*Id.*) Dr. Mankins prescribed Lortab for pain and a trial of Neurontin. (*Id.*) Dr. Mankins summarized his findings in a letter dated December 9, 2004, also noting Plaintiff's history of chronic anxiety and depression. (Tr. 276.)

On October 4, 2004, Dr. Smith noted that Plaintiff was seen for a follow-up for "Major Depression-Recurrent-Moderate and Personality Disorder NOS." (Tr. 251.) Despite increased stresses related to medical issues and being a little more anxious, Plaintiff stated that her mood and energy levels were good. (*Id.*) Dr. Smith observed that Plaintiff's affect was bright and noted that Plaintiff acknowledged that her increased anxiety may have been related to recent medical stressors and agreed that she would allow herself time to adjust. (*Id.*)

**Plaintiff's Testimony at the Hearing**

The Administrative Law Judge ("ALJ") convened Plaintiff's hearing on January 20, 2005. (Tr. 304.) Plaintiff was not represented by counsel. (*Id.*) Plaintiff and Clifton King, a Vocational Expert ("VE"), testified. (*Id.*) Plaintiff testified that she does not get dressed every day, only on her good days. (Tr. 313.) She claims that her depression sometimes lasts up to two weeks at a time. (*Id.*) She stays in bed and does not answer the door or the phone. (*Id.*) Plaintiff owns and uses a scooter and walks from her home to various places.[2] (Tr. 313-14.) Her husband helps her read her mail because she does not understand big words. (Tr. 309.) She is able to microwave meals. (*Id.*) She sometimes goes grocery shopping, but gets distracted and can't remember what she needs. (Tr. 310.) She sometimes calls the police station if she cannot find a phone number in the telephone book. (Tr. 311.) She stated that she does not work because she cannot stay focused. (Tr. 316.) She can only stand for twenty minutes at a time because her legs go numb. (Tr. 317.)

**The ALJ's Decision**

Following a *de novo* hearing on January 20, 2005, the ALJ denied Plaintiff's claims. (Tr. 58-59.) The ALJ concluded that Plaintiff is unable to perform her past relevant work. (Tr. 28, Finding No. 7.) However, he also found that Plaintiff has the residual functional capacity ("RFC") to perform light work activity, diminished by significant nonexertional limitations and limited to occupations that would require performance of routine, repetitive, low-stress work. (Tr. 28, Finding No. 6.) The ALJ found that despite the fact that Plaintiff's exertional and nonexertional limitations did not allow her to perform the full range of light work, there were a significant number of jobs in

---

[2] Plaintiff's family drives her to and from her medical appointments. (Tr. 257.)

7

the national economy that Plaintiff could perform. (Tr. 28, Finding No. 12.) The Appeals Council denied Plaintiff's request for review and the ALJ's findings became the final decision of the Commissioner.

## STANDARD OF REVIEW

The court's review of the Commissioner's decision is limited to determining whether the decision is supported by substantial evidence and whether the proper legal standards were applied to evaluate the evidence. *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995) (per curiam). "The Commissioner's decision is granted great deference and will not be disturbed unless the reviewing court cannot find substantial evidence in the record to support the Commissioner's decision or finds that the Commissioner made an error of law." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (footnotes omitted). "The court may not reweigh the evidence or try the issues *de novo* or substitute its judgment for that of the [Commissioner]." *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984). "If the Commissioner's findings are supported by substantial evidence, then the findings are conclusive and the Commissioner's decision must be affirmed." *Martinez*, 64 F.3d at 173. "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion." *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). It is "more than a mere scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993).

To determine whether a claimant is disabled, the Commissioner uses a five-step sequential inquiry. *Leggett*, 67 F.3d at 563; *Martinez*, 64 F.3d at 173-74. The Commissioner must consider whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an

impairment listed in Appendix 1, Subpart P, Regulation No. 4; (4) the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform relevant work that exists in significant numbers in the national economy. *Leggett,* 67 F.3d at 563 n.2; *Martinez*, 64 F.3d at 173-74; 20 C.F.R. § 404.1520 (1998). The burden of proof is on the claimant for the first four steps, but shifts to the Commissioner at step five. *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994) (citing *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989)). At step five, once the Commissioner demonstrates that other jobs are available to a claimant, the burden of proof shifts to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990).

For purposes of social security determinations, "disability" means an inability to engage in substantial gainful activity because of any medically-determinable physical or mental impairment or combination of impairments that could be expected either to result in death or to last for a continuous period of not less than twelve months. *See* 42 U.S.C. § 423(d)(1)(A). To establish disability, the record must show that the limitations imposed by the claimant's conditions prevent her from engaging in any substantial gainful activity. *See Jones v. Heckler*, 702 F.2d 616, 620 (5th Cir. 1983).

On appeal, this Court's function is to ascertain whether the record, considered as a whole, contains substantial evidence that supports the Commissioner's factual findings and whether any errors of law were made. *Martinez*, 64 F.3d at 174 (citing *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991)). Four elements of proof must be weighed: (1) the objective medical facts; (2) the diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) the claimant's age, education, and work history. *Id*. The ALJ has a duty to develop the facts fully and fairly relating to an applicant's claim for disability benefits.

*Ripley*, 67 F.3d at 557.

## ANALYSIS

### Residual Functional Capacity

Plaintiff contends that the ALJ's residual functional capacity ("RFC") assessment is the result of legal error because the ALJ fails to comprehensively set forth the "total limiting effects" of all of Plaintiff's impairments (including non-severe ones) in combination in violation of 20 C.F.R. § 404.1545(e). Specifically, Plaintiff argues that the ALJ previously found Plaintiff to have a "mild to moderately impaired" social functioning limitation, but he failed to include that limitation when he questioned the VE about whether there were jobs in the local and national economies that Plaintiff could perform. The Commissioner states that the ALJ's RFC determination is supported by substantial evidence and notes Plaintiff's ability to take care of her disabled husband, her terminally ill mother, and her grandchildren. He also mentions Plaintiff's talkativeness in settings such as grocery stores and the doctor's office as supporting the determination. Additionally, the Commissioner offers the "post hoc rationalization" that Plaintiff was not prejudiced by the ALJ's omission because the three unskilled, light jobs that the VE suggested do not require any interaction with people or the public, according to the U.S. DEPARTMENT OF LABOR, DICTIONARY OF OCCUPATIONAL TITLES (DOT). *See* DOT (4th ed. rev. 1991), 323.6870-014 (maid), 529.687-186 (vegetable sorter), and 781.687-070 (hand trimmer).

Social functioning refers "to [a claimant's] capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00C(2). In assessing Plaintiff's RFC, the ALJ should consider, among other things, Plaintiff's ability to engage in the activities of daily living; to interact appropriately with the public,

supervisors, and co-workers; to focus long enough to complete tasks in a timely fashion; and to adapt to stressful circumstances without either withdrawing from the situation or experiencing increased signs and symptoms of the claimant's mental disorder. *Id.* at 12.00(C).

"Unless the hypothetical question posed to the vocational expert by the ALJ can be said to incorporate reasonably all disabilities of the claimant recognized by the ALJ, and the claimant or his representative is afforded the opportunity to correct deficiencies in the ALJ's question by mentioning or suggesting to the vocational expert any purported defects in the hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question), a determination of non-disability based on such a defective question cannot stand." *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994).

When the ALJ evaluated Plaintiff's mental impairments under Listings 12.04 (Affective Disorders) and 12.08 (Personality Disorders), he specifically found that Plaintiff "has mild to moderate difficulties in maintaining social functioning." (Tr. 22.) However, the ALJ found that Plaintiff did not meet these listings. At the hearing, the ALJ posed two hypothetical questions to the VE:

**Hypothetical Question Number One**

Q. Mr. King, the first hypothetical assumes a 49 year old individual who is almost 50 who possesses the strength to perform a wide range of light work. However, this individual in the area of nonexertional limitations would perform one and two step repetitive tasks, routine repetitive low stress work. Given those limitations, would any past work be available?

A. No, Your Honor.

Q. Would any work be available of an unskilled nature?

A. Yes.

Q. What would that be, sir?

A.  Maid/housekeeper, light, unskilled, SVP of 2, Texas approximately 16,000, nationally approximately 135 to 150,000.

Q.  All right.

A.  The job of vegetable sorter, light, SVP of 2, Texas approximately 3,000, nationally approximately 80,000. The job of hand trimmer. It's a textile job, light, unskilled, SVP of 2, Texas 12,000, nationally 200,000.

## Hypothetical Question Number Two

Q.  All right. The next hypothetical assumes the same vocational factors. However, this individual while possessing no exertional limitations would possess a 20 percent reduction in concentration capability, along with the diminished ability to relate appropriately with peers and coworkers. Given those limitations, would any work be available?

A.  No, Your Honor.

ALJ:  All right. Counsel, you have the right to cross-examine Mr. King. Do you have any questions for him?

REP:  No, Your Honor. I do not.

The ALJ found that Plaintiff:

has the residual functional capacity to perform a wide range of light work. Her residual functional capacity for light work is diminished by significant nonexertional limitations. She has limitations regarding sustained concentration and persistence in that she is able to perform only simple, unskilled one to two step repetitive tasks. Regarding stress limitation, she is able to perform routine, repetitive, low-stress work.

(Tr. 41, Finding No. 6.) In determining Plaintiff's RFC, the ALJ relied upon the VE's answer to the first of the two hypothetical questions. The ALJ did not include the mild to moderate social functioning limitation which he had previously found when he was determining whether Plaintiff met a listing.[3] Thus, the ALJ failed to incorporate reasonably all disabilities of the claimant

---

[3] Even the second hypothetical does not mention a limitation on the individual's ability to be around or to relate to the public, or to supervisors in a work situation.

recognized by the ALJ. With respect to whether the claimant or her representative were afforded the opportunity to correct deficiencies in the ALJ's hypothetical questions to the VE, due to Plaintiff's impaired mental status and her lack of counsel, Plaintiff had no "real" opportunity to correct any defects in the hypothetical. Under *Bowling*, the ALJ's determination of non-disability based on the first hypothetical, which left out the social functioning limitation, is reversible error. *See Bowling*, 36 F.3d at 433.

When a claimant appears without counsel, the ALJ's usual duty to develop the record "fully and fairly" becomes "heightened," such that he must "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts." *Kane v. Heckler*, 731 F.2d 1216, 1219-20 (5th Cir. 1984). The ALJ failed to meet this burden here. Despite evidence in the record that Plaintiff was fired, reprimanded, and disciplined for "always talking to the people and not getting her work done" and not "understanding what to do" on the job, the ALJ never questioned Plaintiff about her social functioning at work. Additionally, he failed to address her inability to understand boundaries and her inability to express anger appropriately. Further, he failed to address whether she could relate to supervisors or the public. The ALJ's errors in the adjudication of Plaintiff's social functioning limitations are not harmless, as indicated by the VE's answer to the second hypothetical question. Reversal and remand for further development of this issue is required.

On remand, the ALJ should also clarify the extent and specific respects in which Plaintiff's diminished social functioning at work is limited. The basis upon which the ALJ's decision purports to rest must be set forth with such clarity as to be understandable. A reviewing court should not be compelled to guess at the theory underlying the agency's action. *See SEC v. Chenery*, 332 U.S 194, 196-97 (1947); *see also Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994) (citing *Chenery* and

13

reversing on basis that the "ALJ's vague and confusing reference" to vocational testimony left the court unsure that the ALJ had properly considered it); *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (determinations of non-disability must "stand or fall with the reasons set forth in the decision as affirmed by the Appeals Council"); *Orphey v. Sec'y of H.H.S.,* 962 F.2d 384, 386-87 (5th Cir. 1992) (reversing and remanding because the ALJ's decision was unclear on whether he had properly considered claimant's substance abuse as an impairment that could be potentially disabling); *Bagwell v. Barnhart*, 338 F. Supp. 2d 723, 735 (S.D. Tex. 2004) (court could "scarcely perform its assigned review function" when the ALJ failed to reconcile inconsistencies pertaining to the RFC finding).

## **Treating Physician**

The Court has reconsidered the ALJ's reasoning for giving "little weight" to the assessment of Plaintiff's treating psychiatrist, Dr. Smith. Plaintiff alleges that the ALJ committed reversible error by refusing to afford controlling weight to the medical opinions of her treating psychiatrist, Dr. Smith, and thus made medical inferences that were not warranted by clinical findings. (Pl.'s Br. at 16-18.)

"[O]rdinarily the opinions, diagnoses, and medical evidence of a treating physician who is familiar with the claimant's injuries, treatments, and responses should be accorded considerable weight in determining disability." *Greenspan*, 38 F.3d at 237; *accord Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Scott v. Heckler*, 770 F.2d 482, 485 (5th Cir.1985). The opinion of a specialist generally is accorded greater weight than that of a non-specialist. *See Newton*, 209 F.3d at 455; *Paul v. Shalala*, 29 F.3d 208, 211 (5th Cir.1994), overruled on other grounds by *Sims v. Apfel*, 530 U.S. 103, 108 (2000). Medical opinions are given deference, however, only if those opinions are shown to be more than conclusory and supported by clinical and laboratory findings. *See Scott*, 770 F.2d

at 485. Moreover, a treating physician's opinions are far from conclusive and may be assigned little or no weight when good cause is shown. *See Myers*, 238 F.3d at 621; *Loza*, 219 F.3d at 395; *Greenspan*, 38 F.3d at 237. Good cause may permit an ALJ to discount the weight of a treating physician's opinion in favor of other experts when the treating physician's evidence is conclusory, unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence. *See Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 456 (citing *Brown,* 192 F.3d at 500; *Greenspan*, 38 F.3d at 237; *Paul*, 29 F.3d at 211). Nevertheless, the ALJ has sole responsibility for determining a claimant's disability status. *See Paul*, 29 F.3d at 211; *accord Myers*, 238 F.3d at 621; *Newton*, 209 F.3d at 455.

Plaintiff had been treated at MHMR for her mental impairments since 1999. Dr. Smith was the head psychiatrist who oversaw Plaintiff's mental-health care at MHMR. (Tr. 254-65.) A mental functional limitation assessment of Plaintiff at MHMR on December 1, 2003, diagnosed Plaintiff with major depression and personality disorder. (Tr. 254, 259.) According to the assessment, Plaintiff experienced "marked restrictions" of daily living and in maintaining social functioning and met Listings 12.04 and 12.07. (*Id.*) The ALJ gave "little weight" to the assessment of the treating physician and found that Plaintiff did not meet any Listings. (Tr. 25-26.) In his decision, the ALJ discredited Dr. Smith's medical opinion because:

> Dr. Smith's assessment was not substantiated by the clinical findings and is inconsistent with the other evidence of record. For example, the progress notes from Helen Farabee on October 4, 2004 indicate the claimant's affect was bright and her underlying mood was reported to be good. She stated that her energy levels were mostly good. (Exhibit 10F) *This was reported within two months of the date of the functional evaluation.* [Emphasis supplied].

(Tr. 25.) However, the record shows that Dr. Smith's functional evaluation was on December 1, 2003, *eight months before the October 4, 2004 progress notes*. Thus the only evidence to which the

15

ALJ referred to support an inconsistency are the progress notes of October 4, 2004, which the ALJ incorrectly concluded were within two months of Dr. Smith's functional evaluation on December 1, 2003. A review of the record reveals no progress notes from Helen Farabee which are within two months of the MHMR functional evaluation. The ALJ failed to make explicit findings which would enable this court to review his decision concerning the treating psychiatrist's assessment with more than mere conjecture.

The ALJ also discredited the treating psychiatrist's evaluation because in a consultative evaluation in June 2003, "the claimant indicated she is able to handle basic hygiene, dressing, and feeding independently." (Tr. 25.) However, six months after the consultative examination, at the time of the MHMR assessment, Plaintiff was not handling basic hygiene at all. (Tr. 254.) The treating psychiatrist noted that this was "a very big contrast" because Plaintiff "has always appeared exceptionally well groomed in past years." The ALJ did discuss any of the factors set forth in § 404.1527(d)(2) after he decided not to give Dr. Smith's psychological opinions controlling weight. Rather, the ALJ decided that because in June 2003, six months before the treating psychiatrist's assessment, Plaintiff reported that she could do some housecleaning and vacuuming, prepare easy meals, pet her dog, and plant and water flowers, the treating psychiatrist's assessment was entitled to "little weight." The ALJ should have considered the § 404.1527(d)(2) factors in deciding what weight, if any, to give the opinion short of controlling weight, or recontacted the treating psychiatrist. This is particularly true in light of the fact that Plaintiff was proceeding without counsel and had been treated at Helen Farabee for her ongoing mental impairments since 1999.

In promulgating the mental impairments listings, the Commissioner acknowledged that occasional symptom-free periods and the sporadic ability to hold a job are not inconsistent with, but

16

rather are symptomatic of, a claimant's mental disability. *See Leidler v. Sullivan*, 885 F.2d 291, 292 n.3 (5th Cir. 1989) (citing *Poulin v. Bowen*, 817 F.2d 865, 875-76 (D.C. Cir. 1987)). In cases where a person's disability causes her ability to work to wax and wane, the Fifth Circuit Court of Appeals not only requires a determination that a claimant can perform certain jobs, but it also "requires a determination that the claimant can *hold* whatever job he finds for a significant period of time." *Singletary v. Bowen*, 798 F.2d 818, 822 (5th Cir. 1986). This is particularly true if the claimant's medical evidence shows her mental condition is a long-term problem and not just a temporary setback. *Id.* The mental health doctors at Helen Farabee had treated Plaintiff's mental impairments since January 1999, when Plaintiff was diagnosed with "major depression, recurrent, moderate; panic disorder; generalized anxiety disorder; personality disorder – histrionic and dependent traits." (Tr. 123.) The mental health doctors prescribed three psycho-active medications. (*Id.*)

The ALJ failed to develop the record sufficiently to determine whether Plaintiff's occasional periods of stability were symptomatic of her mental disability. While evidence of bad and good days does not of itself establish an impairment sufficient to require an explicit finding on maintaining employment, *see Perez v. Barnhart,* 415 F.3d 457, 465 (5th Cir.2005), the evidence in this case was not so limited. The consultative psychiatrist, who the ALJ credited over the treating psychiatrist, indicated that the background information that Plaintiff gave appeared to be reasonably reliable and in harmony with the test results.[4] (Tr. 153.) This included Plaintiff's indication "that on some occasions, she may go to bed for 2 weeks at a time and won't want to do anything." (Tr. 153.) At these times she does not "take out the trash or get out of bed." (*Id.*) "[S]he just wants to pull the

---

[4] Notably, the consultative psychiatrist rated Plaintiff's current and past GAF at 48, lower than the current and past GAF of 55, assessed by MHMR. (Compare Tr.156 to 267).

covers up over her head." (*Id.*) Dr. Lilly, found that Plaintiff was "moderately limited" in the ability to "complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods." (Tr. 159.) The record shows that Plaintiff held thirty-three low level jobs, all for unusually short periods of time. (Tr. 77-84.) The ALJ neither questioned Plaintiff about this work history at the hearing nor mentioned it in the Decision. In light of Plaintiff's long-term mental condition in which her symptoms appear to fluctuate, the ALJ erred by failing to consider the *Singletary* requirement that a claimant be able to hold a job for a significant period of time. These errors affect Plaintiff's substantial rights, and they require further development on remand.

In light of the foregoing reasons for remanding this case for further consideration, the Court need not address the remainder of Plaintiff's claims: her alleged Hepatitis C, her alleged limitations due to problems with her lower extremities, and her alleged travel restrictions. On remand, the Commissioner shall fully reconsider the entire record, and the ALJ shall fully exercise his "basic obligation to develop a full and fair record" with respect to all of Plaintiff's alleged severe impairments. *See Kane*, 731 F.2d at 1219.

## **CONCLUSION**

The Commissioner's decision is the result of prejudicial legal error. The ALJ omitted Plaintiff's mild to moderately impaired social functioning limitation during the assessment of Plaintiff's RFC to perform other work that exists in significant numbers in the national and local economies. Additionally, the Commissioner's assessment of the treating psychiatrist's opinion is the result of prejudicial legal error. Finally, because Plaintiff's mental impairments appear to wax and wane, the Commissioner should have followed the *Singletary* requirements. Accordingly, the

Commissioner's decision is reversed and remanded for further consideration and if necessary, further development of the record.

IT IS SO ORDERED this 18th day of November,2008.

PAUL D. STICKNEY
UNITED STATES MAGISTRATE JUDGE